IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| COMPANION PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>CHARLES DAVID WOOD, JR.; AMS STAFF LEASING, INC., d/b/a/ AMS Staff Leasing Corporation; BRECKENRIDGE ENTERPRISES, INC., d/b/a/ AMS Staff Leasing II; AMS Staff Leasing II, Inc.; HIGHPOINT RISK SERVICES, LLC; and ASPEN ADMINISTRATORS, INC.,<br><br>    Defendants. | C/A No.  3:14-cv-03719-CMC<br><br><br><br>OPINION AND ORDER<br>ON CROSS-MOTIONS<br>FOR PARTIAL SUMMARY JUDGMENT<br>AND RELATED MOTIONS<br>TO STRIKE OR EXCLUDE TESTIMONY,<br>EXHIBITS, AND ARGUMENTS<br>(ECF Nos. 199, 201, 202, 239, 252) |

This matter is before the court on cross-motions for partial summary judgment and several related motions.  The motions and resolution are as follows:

1.     Defendants' Motion for Partial Summary Judgment, ECF No. 201, is granted in part and denied in part;

2.     Plaintiff's Motion for Partial Summary Judgment, ECF No. 202, is granted in part and denied in part;

3.     Defendants' Motion to Exclude Opinion Testimony of Charles L. McGimsey, ECF No. 199, is denied;

4.     Defendants' Motion to Strike Declaration of Charles L. McGimsey, ECF No. 239, is denied;

5.     Plaintiff's Motion to Strike Certain Exhibits and Arguments, ECF No. 252, is denied.

# BACKGROUND[1]

**Parties.** This action arises out of a contractual relationship between Plaintiff, Companion Property and Casualty Insurance Company ("Companion"), and a group of interrelated businesses. The latter include Defendants AMS Staff Leasing Inc., d/b/a AMS Staff Leasing Corporation ("AMS"), Breckenridge Enterprises, Inc., d/b/a AMS Staff Leasing II ("Breckenridge"); AMS Staff Leasing II, Inc., ("AMS II"), and Aspen Administrators, Inc. ("Aspen"), each of which is a party to two related agreements referred to as the "2006 Coverage Agreement" and the "Claims Agreement." The 2006 Coverage Agreement provided, inter alia, for the issuance of Workers Compensation policies to or on behalf of AMS, Breckenridge, and AMS II (collectively "PEO Defendants").[2] The Claims Agreement authorizes Aspen to act as third-party claims administrator for claims made under the 2006 Coverage Agreement.

The three PEO Defendants and Aspen are owned by Defendant Charles David Wood, Jr. ("Wood"). Wood signed a Guaranty and Indemnity Agreement ("Wood Guaranty") in favor of Companion guaranteeing full performance under the 2006 Coverage and Claims Agreements.

Wood also owns Defendant Highpoint Risk Services, LLC ("Highpoint"). Highpoint is not a party to the Coverage Agreement, Claims Agreement, or Wood Guaranty but allegedly played a role in issuing policies on which certain claims are based.

---

[1] The court provides limited background here, sufficient to identify the parties and general relationship. Where necessary, further detail is provided under the relevant section of the Discussion.

[2] "PEO" refers to "professional employer organizations." Second Amended Complaint ¶ 2 (ECF No. 88). These are entities which "contractually assume employer rights, responsibilities, and risks with employees who are then leased by the PEOs to various clients, primarily in the construction industry." *Id.*

Wood previously owned Dallas National Insurance Company ("Dallas National"), an additional signatory to the 2006 Coverage Agreement that acted as reinsurer for policies issued under that agreement. Wood sold Dallas National to a third-party in March 2013. After that sale, Companion, Dallas National, and Dallas National's new owner entered into agreements referred to as the 2013 Program Agreement and 2013 Guaranty.[3] Dallas National was placed into receivership during or after April 2014 and is not a party to this litigation.

In or around July 2013, Companion terminated Defendants' authority to write new business or renew policies under the 2006 Coverage Agreement. The relationship between the parties was not, however, ended as claims continued to be processed and paid during the run-off period ("Run-Off") that followed. Much, but not all, of the present litigation relates to Companion's handling of claims and collateral and Defendants' payment (or non-payment) of claims and collateral obligations (and related obligations under the Wood Guaranty) during Run-Off, which continues to this day.

**Litigation.** Defendant Highpoint first initiated litigation against Companion in the Northern District of Texas ("Texas Action") on August 20, 2014. *See* ECF No. 23-1 at 1 (motion to dismiss identifying *Highpoint Risk Services, LLC v. Companion Property & Casualty Insurance Company*, No. 3:14-cv-3398-L (N.D. Tex. filed Aug. 20, 2014) as first filed action). That action sought return of certain funds relating to what the court and parties have referred to as a "PayGo" line of business.

---

[3] The effect of the 2013 Program Agreement and 2013 Guaranty are among the issues addressed in the parties' partial summary judgment motions.

Companion then initiated this action on September 19, 2014, seeking a declaratory judgment as to the same subject matter and asserting additional claims as to other lines of business. This court stayed claims to the extent related to the PayGo line of business, in deference to the first filed action in the Northern District of Texas.[4]

This matter has proceeded as to all other claims and counterclaims with discovery concluding for most purposes on August 1, 2016. The court extended discovery for limited purposes through mid-October 2016. The parties filed cross-motions for partial summary judgment on October 28, 2016. Briefing on those motions and several related evidentiary motions is now complete.

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

_____

[4] The Northern District of Texas has twice denied motions to transfer venue here based, in part, on a determination the PayGo line of business is not covered by the 2006 Coverage Agreement. Companion indicated in a recent memorandum that it is appealing the more recent order, which was issued by a magistrate judge, to the district judge to whom the matter is assigned. *See* ECF No. 252 § I n.6.

Rule 56(c)(1) provides as follows:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or
> >
> > (b)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

The discussion that follows considers all arguments relating to a given subject matter together.  Thus, where Companion and Defendants have moved for summary judgment on the same claims or counterclaims or filed related evidentiary motions, the related portions of the various motions are considered together.[5]

## I.      Claims Relating to Above-Deductible Payments

**Arguments.**  Companion seeks summary judgment on its second cause of action and Defendants' fifth counterclaim.  *See* ECF No. 88 ¶¶ 50-58 (second cause of action); ECF No. 90 ¶¶ 249-57 (fifth counterclaim).  As to both the claim and counterclaim, Companion seeks a ruling that it has no obligation to reimburse Defendant AMS for payments made from AMS's funds for claims exceeding AMS's deductible ("Above-Deductible Payments").  Alternatively, Companion asks the court to rule that its obligation does not exceed $66,141.

---

[5]  The parties have also filed various motions to seal unredacted versions of their memoranda and to file a limited number of exhibits under seal.  These motions will be addressed by separate order(s).

Defendants' fifth counterclaim suggests AMS is seeking in excess of $9 million in unreimbursed Above-Deductible Payments. However, shortly before the dispositive motions deadline, AMS stipulated it is seeking no more than $1,826,145 on this counterclaim. ECF No. 196 (filed October 19, 2016). Companion argues even this amount is overstated. In support of this argument, Companion relies on a Declaration by McGimsey (ECF No. 214-6 ("McGimsey Declaration")), which challenges the accuracy of a spreadsheet prepared by Kara Childress ("Childress Spreadsheet") and corresponding opinion by Defendants' expert, Key Coleman.[6] McGimsey explains in detail what he believes are multiple errors in Childress's analysis, including a failure to take into account various adjustments. Ultimately, he opines the maximum amount of unreimbursed payments is $66,141.

Companion further argues that, regardless of the amount of unreimbursed Above-Deductible Payments, AMS is entitled to no recovery because AMS's co-Defendant and owner, Wood, is ultimately responsible under the Wood Guaranty for any failure by Dallas National to reimburse AMS for Above-Deductible Payments. Finally, Companion argues Defendants are equitably estopped from seeking relief on this counterclaim because they failed to alert Companion to any concerns about reimbursements when Companion might have corrected the problem (most critically before Dallas National went into receivership).

---

[6] Companion subsequently filed a Motion to Strike Certain Exhibits and Arguments, which seeks, inter alia, to exclude the Childress Spreadsheet. ECF No. 252 § IV (arguing Childress Spreadsheet is inadmissible hearsay). The court has considered this motion and related memoranda in resolving the present motion.

In their memorandum in opposition to summary judgment (ECF No. 235), as well as in a separate motion to strike (ECF No. 239), Defendants argue McGimsey's Declaration should not be considered. The latter argument is based largely on Companion's failure to offer such opinions prior to the close of discovery.[7] Defendants also argue the Childress Spreadsheet and Coleman's opinion are valid and based on objective, verifiable data and assert McGimsey concedes at least some funds are due.

Defendants respond to the alternative argument that Wood is ultimately responsible for any failure by Dallas National to reimburse AMS for Above-Deductible Payments by noting Companion still holds collateral to fulfill Dallas National's obligations. They also argue, inter alia, any shortfall in that collateral is the fault of either Companion, or Dallas National's new owner, relieving Wood of any responsibility. Finally, as to the equitable estoppel argument, Defendants argue there is no evidence AMS lulled Companion into believing the Above-Deductible Payments would all be settled by Wood or Dallas National.

On reply, Companion argues the timing and circumstances relating to Childress's deposition justify any delay in proffering McGimsey's Declaration opinions. It challenges arguments Coleman's opinion and the Childress Spreadsheet are admissible. The latter argument is also addressed in Companion's later Motion to Strike (ECF No. 252). Companion argues it has no obligation to pursue Dallas National or deplete Dallas National's collateral (which Companion

---

[7]  The court has considered all memoranda relating to the motion to strike McGimsey's Declaration. *See* ECF Nos. 239, 251, 254. Defendants also filed a separate motion to exclude opinion testimony of McGimsey. ECF No. 199. The court has considered this motion to the extent it relates to this subject matter (*id.* § IV.A.), as well as related opposition and reply memoranda (ECF Nos. 235, 249) in ruling on this aspect of Companion's motion for partial summary judgment.

7

maintains is already underfunded) before pursuing Wood on his Guaranty. Finally, it argues silence may support equitable estoppel, and it was given no notice of any concern before December 2013.

**Discussion.** The court has fully considered arguments made in the parties' memoranda in support of and in opposition to Companion's summary judgment motion on its second cause of action and Defendants' fifth counterclaim, as well as related arguments in support of and opposition to Defendants' motions to exclude opinion testimony of McGimsey and to strike his Declaration, and Companion's motion to strike the Childress Spreadsheet. Having done so and for reasons explained below, the court concludes Companion's motion for partial summary judgment should be denied as to this claim and counterclaim because there are genuine issues of material fact as to whether Defendants were fully reimbursed for Above-Deductible Payments made from AMS-funded accounts or received other recoveries offsetting any such payments.

These are subjects that require analysis of complex and extensive data and on which both sides have offered expert testimony. The court has, therefore, considered the parties' related evidentiary motions in resolving this aspect of Companion's motion for partial summary judgment. Those motions are denied for reasons explained below as they relate to the Above-Deductible Payments issue.

**Defendants' Motions to Strike or Exclude.** The concerns identified by Defendants in both their motion to exclude McGimsey's opinion testimony (as it relates to the issue of Above-Deductible Payments) and motion to strike McGimsey's Declaration are primarily matters for cross examination at trial. The court is, moreover, persuaded that the nature of McGimsey's Declaration (as rebuttal to Coleman's expert opinion), combined with Companion's delayed opportunity to question Childress about her spreadsheet (and, consequently, the foundation for

8

Coleman's opinion), support consideration of the McGimsey Declaration for purposes of summary judgment.[8]

**Companion's Motion to Strike.** The court also denies Companion's motion to strike the Childress Spreadsheet (and implicit challenge to Coleman's opinion to the extent it relies on that spreadsheet). ECF No. 252 § IV. The concerns Companion and McGimsey raise are appropriate for cross examination at trial but do not, at least at this stage, support exclusion. Neither do they warrant a declaratory judgment that the maximum amount of unreimbursed Above-Deductible Payments is $66,141 as asserted by McGimsey, given that Defendants have had no opportunity to test McGimsey's analysis through cross examination.

In sum, the rulings as to the evidentiary motions leave both sides with challenged expert testimony on the amount, if any, of unreimbursed Above-Deductible Payments. In making these rulings, the court has resolved any close questions (as to both sides' motions) in favor of allowing rather than excluding expert testimony at this stage and deferring any final determination of admissibility until the court may consider the proffered testimony in context at trial.

**Alternative Grounds for Summary Judgment.** Companion's alternative arguments also fail to support summary judgment. The argument Wood is ultimately responsible fails to recognize that, despite common ownership, Wood and AMS are separate entities. Thus, even if Wood must ultimately reimburse Companion for any amount Companion owes to AMS, it would not defeat this counterclaim. Defendants' arguments as to the continued availability of Dallas National collateral, and the possible reasons for any deficiencies, also raise concerns which preclude

---

[8] While the court denies the motion to strike McGimsey's Declaration, it also denies Companion's motion for partial summary judgment on related issues even considering the opinions in that Declaration.

summary judgment. *See also infra* § V (addressing related argument regarding application of the Wood Guaranty to Dallas National's obligations).

The court also finds the equitable estoppel argument unavailing as a basis for summary judgment. To the extent and for whatever period AMS was receiving timely and adequate reimbursement or credit from Dallas National, it presumably had no reason to alert Companion to any concern. While AMS concedes some amounts may have been unpaid prior to June 2013, it suggests the problem with non-payment (particularly for Florida policies) arose after that date. Thus, any claim for estoppel would presumably have to arise during this period. There is, however, no specific evidence or argument advanced to support a claim of estoppel arising during this period, and certainly no evidence or argument that supports a ruling as a matter of law.

For the reasons set forth above, the court (1) denies Companion's motion for summary judgment on its second cause of action and Defendants' fifth counterclaim; (2) denies Defendants' motion to strike McGimsey's Declaration; (3) denies Defendants' motion to exclude opinion testimony of McGimsey (to the extent his testimony relates to this subject matter); and (4) denies Companion's motion to strike to the extent it relates to the Childress Spreadsheet (or Coleman's related opinion). The rulings on evidentiary motions do not preclude the parties from testing and challenging the adequacy of expert testimony and underlying foundation at trial.

## II.     Claims Relating to Below-Deductible Payments

Both sides seek summary judgment on Companion's third cause of action for breach of contract. ECF No. 202 Argument § II; ECF No. 201-1§ II.C. This cause of action seeks damages for Defendants' alleged failure to reimburse Companion for payments made for Below-Deductible claims ("Below-Deductible Payments"). ECF No. 88 ¶¶ 59-65. Companion also seeks summary

judgment on Defendants' related first through third counterclaims.[9]  Those counterclaims seek relief for Companion's alleged misuse or improper retention of collateral held for the purpose of satisfying Defendants' Below-Deductible obligations.  ECF No. 90 ¶¶ 231-35 (asserting claims for breach of contract, breach of special relationship, and conversion).  The arguments in these motions and related aspects of Defendants' motion to exclude McGimsey's expert opinions (ECF No. 199) are summarized below.

> **Companion's Arguments.**  Companion argues the 2006 Coverage Agreement requires Defendants to regularly reimburse Companion for amounts disbursed for Below-Deductible Payments.  While Companion agrees it has the right to use collateral to pay claims under that agreement, it argues it is not required to do so.  Companion asserts it has made over $15 million in unreimbursed Below-Deductible Payments.  It does not, however, assert it is out-of-pocket for this amount.  Companion, instead, asserts that it has, at Defendants' insistence, paid claims from AMS's collateral account since roughly October 2013.  This has resulted in the collateral account being underfunded by over $2 million as of June 30, 2015, after which date over $2 million in additional claims have been paid.  Companion relies on McGimsey's proffered expert opinion and an underlying actuarial report for the collateral account calculations.

> Based on these arguments, Companion seeks three alternative summary judgment rulings: (1) Defendants be found liable for $15 million in unreimbursed Below-Deductible Payments; (2) Defendants be found liable for the amount the collateral account was underfunded as of June 30, 2015 (over $2 million), plus additional claims (also over $2 million) paid since that date; or (3) Defendants be found liable on Companion's third cause of action and the matter proceed to trial

---

[9]  Defendants do not seek summary judgment on these counterclaims.

only as to damages.  Companion also asks the court to grant summary judgment that it has no liability on Defendants' first through third counterclaims because it properly took funds from the collateral account to make Below-Deductible Payments.  Companion argues there is no support for any claim it improperly paid non-AMS claims with AMS funds, and it has no obligation to release any remaining collateral at this time.

**Defendants' Arguments.**  Defendants argue the parties agreed sums in the collateral account could be used to reimburse Companion for claims payments.  They maintain Companion has no injury because it has made all Below-Deductible Payments from AMS collateral and over $12 million remains in the collateral account.  Defendants further argue some disbursements from the AMS collateral account ($873,000) were improper because they were used to pay non-AMS claims.  Defendants also argue McGimsey's testimony should be excluded, leaving Companion with no support for its claim the collateral account is underfunded.

In reply in support of their own motion for partial summary judgment, Defendants argue Companion has understated the collateral held and overstated what may be required to cover future claims.  They note the estimate is outdated and suggest subsequent events (including closure of some claims) should reduce the required collateral.

**Defendants' Motion to Exclude Opinion Testimony of McGimsey.**  Defendants also seek to exclude McGimsey's testimony as to Below-Deductible Payments and related collateral through their separate motion to exclude.  They argue McGimsey's opinion Companion was injured by Defendants' non-reimbursement of Below-Deductible Payments is barred by his admission Companion reimbursed itself from collateral funds.  They argue McGimsey's opinion as to any collateral deficiency lacks an adequate foundation because he relied on the actuarial report of another (thus is improperly seeking to offer one expert's opinion through another expert).

12

Defendants also argue the actuarial report provides an inadequate foundation because it is marked "draft."

Companion responds with a Declaration from the individual who prepared the actuarial report, Patrick L. Whatley, who explains the "draft" designation is used within the industry even for documents that are final reports. Whatley avers the document at issue reflects his final analysis. Companion also asserts it was proper for McGimsey to rely on this report because the 2006 Coverage Agreement allowed Companion to require actuarial reports based on whatever methodology it approved. Thus, the very fact Companion received the report supports McGimsey's reliance on it.

**Discussion.** For reasons explained below, the court finds genuine issues of material fact preclude summary judgment on Companion's third cause of action and Defendants' first through third counterclaims. The court, nonetheless, notes one subordinate issue that is no longer in dispute, assuming it ever was: Companion did not breach a contract, breach a special relationship, or convert AMS's funds (counterclaims I-III) *simply* because it used AMS collateral to make *AMS's* Below-Deductible Payments. This conclusion does not resolve any claim or counterclaim, because issues remain as to whether (1) Companion improperly paid claims from the AMS collateral account (*e.g.*, by paying non-AMS claims or making Above-Deductible Payments that were not later reimbursed); and (2) the collateral account was, ultimately, under or over-funded as a result. Resolving these issues is largely dependent on expert witness testimony and analysis of detailed underlying claims and payment data as well as calculation of required collateral.

**Obligation to Reimburse Claims.** As Companion argues, the 2006 Coverage Agreement requires Defendants both to maintain fully-funded collateral accounts, which are to be reviewed

13

and adjusted quarterly, and to reimburse claims paid on a periodic or monthly basis.[10]  This

agreement does not expressly address how claims are to be handled in Run-Off (that is, if new or

renewal policies are not being written).  Most critically, it does not suggest Defendants may stop

reimbursing Companion or the third party administrator for claims paid, and insist that claims be

paid from collateral.  However, as Defendants argue and Companion effectively concedes, the

amount of collateral required to satisfy future claims goes down during Run-Off as claims are

satisfied, though there may not be a direct correlation between claims paid and collateral required

for future payments.[11]  Thus, while Run-Off may not excuse a failure to strictly comply with the

claims-reimbursement provisions of the 2006 Coverage Agreement, it may mean a failure of strict

compliance causes no injury.

     **Companion's Use of Collateral During Run-Off.**  It is undisputed Defendants asked

Companion to use AMS's collateral to make Below-Deductible Payments and Companion did, in

---

[10]  Whether reimbursement is "monthly" or "periodically" is not entirely clear as the 2006 Coverage Agreement addresses claims payments and reimbursement by the AMS Entities (which included Dallas National as reinsurer) in two separate paragraphs.  Paragraph 12 addresses Claims Administration by Aspen and indicates claims payments flow through the "Aspen Claims Operating Account."  (Article III.A. of the Third Party Claims Administration Agreement appears to refer to the same account as the *AMS* Claims Operating Account.)  This paragraph states Aspen will invoice the "appropriate AMS Entity" for claims disbursed on a *periodic* basis on terms acceptable to Companion.  Paragraph 13, on the other hand, addresses the "Claims Reserve Fund," which the court has referred to in this order as the AMS collateral account.  In addition to providing for a quarterly audit and determination of the "appropriate amount of the Required Reserve," this paragraph states "[a]s actual claims are incurred, the AMS Entities shall deposit into the Claims Reserve Fund the amount of such claims on a *monthly* basis[.]"  2006 Coverage Agreement ¶ 13 (emphasis added).

[11]  Companion presents evidence that the collateral required, as calculated by its actuary, was reduced by slightly over $2 million during a period in which Companion paid over $15 million in claims from the collateral account.

fact, use the collateral for this purpose during Run-Off and continues to do so. While there is evidence Companion was forced to do this by Defendants' actions, the evidence may also be susceptible to an inference Companion agreed to or acquiesced in this course of conduct at least prior to filing this action. If a jury finds Companion agreed or acquiesced in this course, Defendants' refusal to reimburse Companion for claims incurred in addition to allowing Companion to hold and use the collateral for that purpose during Run-Off may not support a claim for breach of contract. Defendants would, nonetheless, be required to replace collateral as necessary to maintain adequate collateral balances. *See* 2006 Coverage Agreement ¶ 13. Thus, Defendants could be in breach if they failed to replenish collateral following an audit and request.[12]

**Other Elements of Contract Claim.** Assuming Defendants breached the 2006 Coverage Agreement by insisting Companion pay claims from collateral without reimbursement or by failing to replenish collateral following a proper demand, Companion may be able to recover on its third cause of action, but only if it also establishes it was performing its obligations and it suffered damages as a result of Defendants' breach. While the evidence of breach by Companion is limited, there is at least some evidence it, at some point, improperly paid some claims from AMS-funded

---

[12] Paragraph 13 of the 2006 Coverage Agreement requires quarterly audits be conducted (by Dallas National) to determine the "appropriate amount" of the required reserves. This section appears to envision the AMS entities will add funds based on these audits, though it only expressly provides they must deposit the amount of claims received on a monthly basis *as claims are incurred*. It does not address how "excess" collateral should be handled. At some point, Dallas National ceased arranging the audits. The record is unclear as to when the last audit was completed *prior to litigation*, or whether the results of that audit were communicated to Defendants with a demand they replenish the reserves. An audit conducted during litigation covers the period through June 30, 2015. This audit indicates a shortfall of over $2 million, and was, at some point, communicated to Defendants at least through discovery in this action.

15

accounts for other entities.[13]  As explained in the preceding section, there is also evidence Above-Deductible Payments may have been made from AMS funds.  The present record neither forecloses nor requires the conclusion these alleged actions were material breaches precluding Companion from recovering on its third cause of action.

The issue of damages also cannot be determined on the present record.  Whether Companion suffered any damages as a result of a breach will turn on detailed accounting data, presented, at least in part, through expert witnesses.  Companion relies on McGimsey's expert report and proffered testimony in support of the relevant damages calculations, which testimony Defendants seek to exclude.  *See, e.g.*, ECF No. 199 § V.B.  Having considered the arguments on Defendants' motion to exclude and related arguments in the summary judgment memoranda, the court finds the challenges to McGimsey's testimony raise issues appropriate for cross examination at trial.  The court is not, for example, persuaded that it was improper for McGimsey to rely on an outside auditor's report, particularly in light of the contract language which allows Companion to select the method to be used for actuarial reports.  The court, therefore, declines to exclude McGimsey's testimony as it relates to Companion's third cause of action, but also finds

---

[13]  The evidence does not, however, appear to support Defendants' argument, based primarily on Coleman's report and testimony, that Companion paid $873,000 in such claims for Professional Payroll Solutions ("PPS"), which is identified as a non-AMS entity.  Rather, the evidence cited by Defendants appears to support only an inference that a total of $873,000 was paid for claims of non-AMS entities and some portion of this amount was for PPS claims.  Related testimony from a Companion witness concedes making payments from AMS collateral for PPS claims would be improper, but does not concede such payments were actually made.  Thus, there remain disputed issues of fact on this point.

16

McGimsey's testimony does not support summary judgment. His testimony and Companion's theories of relief should, instead, be tested at trial and resolved by a jury.[14]

**Accounting.** Companion's third cause of action and Defendants' first through third counterclaims raise an additional concern for trial. Because Run-Off is continuing, any expert report prepared or testimony provided during the discovery period will necessarily be incomplete as of the time of trial. Even if updated for trial, the reports and testimony will not support rulings that fully resolve the issues between the parties as the relationship is ongoing. At best, the jury can determine whether Companion has established the elements for breach of contract and determine what the collateral should be (or should have been) at a given point in time. It cannot fully resolve the issues between the parties, at least not if Companion has any further obligation to pay claims, as future actuarial analysis might determine the collateral is under or over-funded and any funds remaining would, ultimately, need to be disbursed to Defendants or allocated to other obligations.

The court raises these concerns now so that the parties may consider how these concerns might be addressed at trial. As appropriate, the parties may consider agreeing to an accounting and related procedures as to issues that may not be readily resolved by a jury.[15]

---

[14]  The court, nonetheless, notes a concern with the two theories of "damages" advanced by Companion in its summary judgment motion (seeking, alternatively, $15 million in unreimbursed claims *or* over $2 million in underfunded collateral as of June 30, 2015 *plus* over $2 million in claims paid after that date). Certainly the first, and to some degree the second, fail to account for the effect payment of claims during Run-Off has on the required collateral.

[15]  Both sides sought an accounting in one form or another through their claims and counterclaims. *See* ECF No. 88 ¶¶ 81-83(Companion's fifth cause of action seeking an accounting of the "business conducted under the Coverage Agreement, the Claims Agreement and the Policies"); ECF No. 90 ¶¶ 245-48 (Defendants' fourth counterclaim seeking an accounting as to claims data, claims payments, actuarial reports and collateral).

### III.     Defendants' Claim for Premium Refund

Companion seeks summary judgment on Defendants' sixth counterclaim.  This counterclaim seeks a refund of premium payments.  While it refers, at some points, to overpayment of premiums on "Policies," the only policy specifically identified is the 2013 Florida Master Policy.  ECF No. 90 ¶¶ 258-64.

**Companion's Argument.**  Companion argues it is entitled to summary judgment on this counterclaim because the plain language of the 2013 Florida Master Policy sets a high-deductible discount of 49.7% and there was no overpayment if that discount rate is used.  It notes Defendants' witnesses conceded they were not aware of any evidence of either an oral or written agreement setting a higher discount rate, but argue for a higher rate based on a claimed prior practice of paying only 30% (corresponding to a 70% discount rate).

Companion notes Defendants' expert, Coleman, calculated the final premium at roughly $3.5 million if the 49.7% discount rate was applied along with the experience factor Coleman opined was appropriate.  Based on this calculation, Companion argues it owes no refund because documentary evidence indicates the premiums paid totaled $3.1 million.

**Defendants' Argument.**  Defendants argue for application of a higher discount rate, 70%. The only support offered for this rate is testimony that such a rate was used in the past.  Defendants also argue they paid roughly $4 million in premiums, thus would be entitled to a refund even if a 49.7% discount rate applied (based on Coleman's calculation).  The only support offered for the claim $4 million in premiums was paid for the relevant period is testimony of two witnesses who stated they *believed* Defendants paid *about* $4 million in premiums.  Defendants do not address Companion's documentary evidence that the amount paid was substantially less.

18

Finally, Defendants argue they are due a refund on the 2012 Florida Master Policy. This argument rests on an email exchange in which a representative of Companion notes an audit suggested a refund of roughly $1 million might be owed, but questions the accuracy of the data on which the audit is based.

**Companion Reply.**  On reply, Companion notes the absence of any reference to the 2012 Florida Master Policy in the sixth counterclaim and argues the Answer and Counterclaim fail to give fair notice this counterclaim seeks a return of premiums as to that policy.  Companion also proffers evidence Defendants never provided audit data necessary to determine the final 2012 premium, despite seeking an extension of time and additional requests from Companion for such data after the extended deadline passed.  ECF No. 247 § III n.10 (citing Hauger dep. at 30-31).  On these grounds, Companion argues Defendants may not pursue any claim for refund of premiums on the 2012 Florida Master Policy.

**Discussion.**  The court grants Companion's motion for summary judgment on Defendants' sixth counterclaim for the following reasons.  First, the controlling document unambiguously provides for a 49.7% rate.  ECF No. 209 at 4.  Defendants' testimony that some more favorable rate was included in prior contracts (or actually used to calculate final premiums in prior years even if not included in the contract) cannot override the clear language in the written contract.[16]

---

[16]  In his report, Coleman opines the discount rate contained in the 2013 Florida Master Policy may be less generous than it should have been in light of industry standards and other factors.  He does not, however, suggest the agreed rate was actually higher.  He also lists a rate for 2012, which was well below the 70% discount rate Defendants claim was applied in the past.  His only reference to a higher discount rate is his statement Defendants' representatives told him a higher rate was used at some unspecified point in the past.

Thus, Companion is entitled to judgment as a matter of law that the proper discount rate is 49.7% and the final premium must be calculated based on that rate.

Defendants' expert, Coleman, calculated the final premium using the 49.7% rate as approximately $3,528,075.   Companion accepts this calculation for purposes of summary judgment.

Given Coleman's calculation, Companion is entitled to summary judgment on the sixth counterclaim (as it relates to the 2013 Florida Master Policy) unless Defendants paid more than $3,528,075.  Defendants argue they meet this burden because they paid $4 million in premiums. The proffered support for the claimed payment consists of two witness's testimony they "believe" Defendants may have paid "about" this amount.  This testimony is too speculative to support Defendants' position, particularly when viewed in light of Companion's documentary evidence the amount paid was roughly $3.1 million.  Therefore, without deciding the amount actually paid, the court holds Defendants have failed to proffer evidence sufficient to support a finding they are owed any premium refund for the 2013 Florida Master Policy.

Defendants' alternative argument they are owed a premium refund on the 2012 Florida Master Policy also fails.  This is, first, because the sixth counterclaim fails to give fair notice it seeks a refund as to any policy other than the 2013 Florida Master Policy.  Even if properly raised, this aspect of the sixth counterclaim would fail because the only proffered support is an email stating that an audit suggested a refund might be owed, but the audit itself was suspect.  Despite requesting and receiving additional time to provide audit data and follow up requests from Companion for that data, Defendants never provided the requested data.  This leaves no more than a possibility that a refund is due.  Accordingly, the court grants Companion's motion for summary judgment on Defendants' sixth counterclaim.

20

**IV.     Companion's Claim for Potential Dual Coverage Liability**

Both sides seek summary judgment on Companion's thirteenth cause of action for breach of fiduciary duty.  Through this cause of action, Companion seeks to hold Highpoint and Wood liable for injuries Companion has suffered or may suffer as a result of Highpoint's failure to make clear whether Companion or Dallas National was responsible for particular risks where policies were issued in the name of both Companion and Dallas National covering the same insured.  ECF No. 88 ¶¶ 173-82.[17]  Companion alleges that, following "Dallas National's demise, various state guaranty funds, as well as other claimants, have taken positions that the coverage afforded by the Companion policies is duplicative of the coverage offered by the Dallas National policies" and are seeking to hold Companion "liable for workers' compensation risks for which Companion did not provide insurance and for which it has received no premium."  *Id.* ¶ 177.  Companion seeks damages for expenses (including attorneys' fees) incurred in defending against these claims as well as repayment for any claims it may be required to pay.  *Id.* ¶ 182 (asserting the alleged breach "has already caused Companion to suffer ongoing expense, including legal expenses, and potentially will result in substantial damage to Companion in the form of claim payments for risks it did not insure and for which it received no premium").

Companion seeks summary judgment on this claim as to liability only, arguing it is entitled to a ruling that Highpoint and Wood are responsible for Companion's legal expenses and any

---

[17] Companion does not challenge the propriety of issuing policies from both insurers for the same insured, only the failure to clarify the risks insured by each insurer.  As Companion explains, the same insureds might be covered by Companion in states where Dallas National was not licensed or for particular clients or jobs that required "A-rated" paper and by Dallas National (and its B-rated paper) for other states, clients, and jobs.  ECF No. 202 § IV (asserting Dallas National's B-rated policies were less expensive and, therefore, more profitable for Defendants).

claims it is required to pay. Defendants seek summary judgment rejecting the claim in full on various grounds including that there was no fiduciary relationship between the parties, most critically as to issuance of policies, because of Companion's role in preparing the policies. For reasons explained below, the court denies Companion's motion for summary judgment and grants Defendants' motion.

**Companion's Arguments.** In support of its motion, Companion argues Highpoint owed and breached a fiduciary duty to Companion to make clear which risks were covered by which insurer when Dallas National and Companion policies were issued to the same employer. ECF No. 202 Argument § IV (explaining that, while the responsible insurer is not clear from the policy itself, it is "clear upon examination of premium records, employer location codes, applicable states, employee classification codes and other criteria."). Companion characterizes Highpoint's role as "handling the underwriting, production, and issuance" of the policies and argues this role supports imposition of a fiduciary duty. *Id.* Companion argues Wood is responsible for Highpoint's breach of fiduciary duty based on his "comprehensive Guaranty Agreement" of obligations arising under the 2006 Coverage Agreement. *Id.*

In its reply in support of its motion, Companion suggests Wood may also be directly responsible because he was "heavily involved in the oversight of Highpoint[] as a producing agent of Companion policies, including Highpoint's issuance of certificates of insurance." ECF No. 247 § IV. Companion characterizes its own role in "issuing" the policies as "simply print[ing] off the policies out of its electronic system" and argues this role "is of no moment [because] Highpoint and Wood issued, underwrote, and produced the policies." *Id.* (asserting "Defendants gathered and provided all of the insureds' information to be input into the policies" and were, therefore, "in the unique position to avoid the potentially 'dual' or 'overlapping' policies").

In opposing Defendants' cross-motion for summary judgment on this claim, Companion argues that, if its motion for summary judgment is denied, it is because there are genuine issues of material fact.  ECF No. 236 § III.B.1.  It argues the evidence demonstrates Highpoint and Wood acted as Companion's "producing agents" and were responsible for issuing policies on Companion paper.  *Id.* (relying, inter alia, on corporate representative's testimony Highpoint was the producing agent).  Companion argues "the potentially overlapping policies written on Dallas National paper were obviously in the control of Highpoint and Wood, because Companion would have known nothing about those policies and certainly had no right or reason to be involved in their issuance." *Id.*  It does not deny that it played a role in "printing off the policies" issued on Companion paper. *Id.*

**Defendants' Arguments.**  Defendants argue they, rather than Companion, are entitled to summary judgment on this claim for three reasons.  First, Highpoint and Wood did not owe or undertake a fiduciary obligation to make clear which clients attached to which insurers as between Dallas National and Companion.   Second, these Defendants breached no duty.   Third, Companion's claimed damages are entirely speculative.

As to the first issue, Defendants point to three provisions of the 2006 Coverage Agreement that refer to Companion being the party that "issues" the policies.  ECF No. 201-1 § II.D.1 (citing ¶¶ 2, 7, 10 of 2006 Coverage Agreement).  They assert Highpoint's role was that of independent agent or broker, which they argue does not give rise to a fiduciary duty to the insurer, and Wood played no role in issuance of the policies. *Id.* (citing cases finding no fiduciary relationship between independent agency and insurer).  Finally, Defendants assert Companion, rather than Highpoint or Wood, actually "issued" the policies through its Point system.  *Id.*; *see also* ECF No. 241 § III.D

(arguing in response to Companion's motion for summary judgment that Highpoint and Wood were neither general agents of Companion nor owed any duty to underwrite or issue the policies).

As to the second issue, whether Highpoint or Wood breached a duty of care, Defendants argue Companion was provided information that identified the AMS clients insured under the relevant policies (the 2012 and 2013 AMS Multi-State Master Policies). ECF No. 201-1 § II.D.2. Defendants note this information was provided before the policies were issued and was used to calculate premiums. *Id.* (citing, *e.g.*, Adams dep. at 191-91); *see also* ECF No. 241 § III.D (summarizing related communications between Companion, Dallas National and AMS-affiliated personnel between December 2011 and April 2013).[18]

Defendants also argue Companion's damages are speculative (third issue). This argument rests on the fact Companion is contesting and has not yet paid any sums demanded by state insurance guaranty funds or others to satisfy what would otherwise be Dallas National's insurance obligations. ECF 201-1 § II.D.3; *see also* ECF No. 241 § III.D.

**Discussion.** "[W]hether [a fiduciary relationship] should be imposed between two classes of people is a question for the court." *Hendricks v. Clemson University*, 578 S.E.2d 711, 715 (S.C. 2003) (contrasting the determination of whether there has been a breach, which may present a jury issue). Under South Carolina law, "[a] confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one imposing the confidence." *Brown v. Pearson*, 483 S.E.2d 477, 484 (S.C. Ct. App. 1997); *see also Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (S.C. Ct. App.1988) ("A fiduciary relationship cannot be established by the unilateral

---

[18] Most if not all of the communications occurred while Dallas National was still owned by Wood.

action of one party. The other party must have actually accepted or induced the confidence placed in him."). South Carolina has recognized a fiduciary duty only in limited circumstances, none of which include the relationship between an insurer and an independent insurance agent. *See generally Consol. Ins. Benefits, Inc. v. Conseco Med. Ins. Co.*, C.A. No. 6:03-cv-3211-RBH, 2006 WL 342389 (D.S.C. Nov. 27, 2006) (noting "no South Carolina Court has recognized a fiduciary duty in the insurer-independent insurance brokerage agency context and only a very few fiduciary relationships based on a 'special confidence' . . . have been recognized").

**Companion's Motion for Summary Judgment.** As noted above, Companion's motion seeks a liability-only determination that Highpoint and Wood owed and breached a fiduciary duty to ensure policies issued on Companion paper were written in a manner that avoided confusion as to the risks covered. To succeed on this motion, Companion must establish, as a matter of law, the existence of a fiduciary relationship giving rise to such a duty. For reasons explained below, Companion has not met this burden.

The absence of South Carolina authority recognizing a fiduciary relationship between insurer and independent broker does not necessarily foreclose the existence of a fiduciary relationship between Highpoint and Companion. This is because the relationship at issue in this action differs from the typical relationship between independent agent and insurer in several respects. Most critically, Highpoint was responsible for production of policies under a fronting arrangement designed to ensure Companion was not, ultimately, financially responsible for paying any claims. Under these circumstances, Companion may have relied more heavily on information provided by Highpoint than it would have in the typical insurer-independent agent relationship.

The specific role played by Highpoint is, however, disputed. Most critically, there are disputed facts as to Highpoint's role in "issuing" or "underwriting" policies, the roles on which

25

Companion relies in arguing Highpoint acted as a fiduciary. As to policy issuance, the 2006 Coverage Agreement provides Companion "shall *issue* the Policies as requested by the AMS Entities subject to" various requirements. 2006 Coverage Agreement ¶ 7 (emphasis added). Nothing in the agreement itself indicates Highpoint plays a role in issuance of the policies. Indeed, the only reference to Highpoint is in a list of costs and expenses, which provides Highpoint will receive a 15% commission "for production of Policies with respect to this Agreement." *Id.* ¶ 10(v). In a footnote to its chart summarizing the parties' responsibilities under the 2006 Coverage Agreement, Companion asserts that, while it "printed off the policies, it was Highpoint that actually issued the policies." ECF No. 202 Facts § I n.1 (relying on admissions in First Amended Answer ¶¶ 21, 174). Specific evidence as to the roles played indicates Highpoint provided the data that was input by Companion into its Point system (a computer program) and this data was used by Companion to produce the actual policies. Companion, however, retained the ability to dictate underwriting requirements and seek additional information when needed. 2006 Coverage Agreement ¶ 2; *see also id.* ¶ 7 (stating "companies with respect to which Policies are issued must meet the underwriting requirements established from time to time by [Companion.].""). Companion offers no evidence Highpoint drafted the policy forms or was responsible for the particular manner in which the policies defined the risks covered, most critically where Companion and Dallas National provided coverage to the same insured.[19]

---

[19] Companion presents no evidence or argument that it was unaware (1) policies were being issued on both Companion and Dallas National paper for the same insured or (2) of the absence of clarifying language it now maintains should have been included in Companion policies when Dallas National provided coverage to the same insured.

Companion also fails to establish, as a matter of law, that Highpoint acted as underwriter. The 2006 Coverage Agreement assigns responsibility for *underwriting* and administrative services to Dallas National, not Highpoint. *Id.* Companion's chart summarizing the parties' relationship acknowledges this division of responsibilities under the 2006 Coverage Agreement, but characterizes Highpoint's role as that of "general agent" based on a General Agency Agreement. ECF No. 202 Facts § I (citing General Agency Agreement ¶ 2)**.** Companion does not attach the cited General Agency Agreement. However, Defendants have filed a General Agency Agreement, which appears to be the agreement to which Companion refers. ECF No. 242-5 (submitted for in camera review). That agreement does state Highpoint serves as general agent, and places underwriting responsibility on Highpoint, but is an agreement *between Dallas National and Highpoint* relating to policies written on Dallas National paper, not between Companion and Highpoint relating to policies written on Companion paper. *Id.* ¶¶ 2, 4(e). It was, moreover, effective April 1, 2013, and, consequently, fails to support the existence of *any* general agency agreement prior to that date. Thus, there is, at most, weak evidence that Highpoint played any underwriting role with respect to the Companion policies at issue.

Given the disputed facts as to the role played by Highpoint, the record fails to support a finding as a matter of law that any fiduciary relationship existed between Companion and Highpoint or Wood, much less a fiduciary relationship giving rise to a relevant duty. It follows that Companion's motion for summary judgment must be denied as to this cause of action. The court also denies Companion's motion for reasons addressed below as to Defendants' motion for summary judgment.

**Defendants' Motion.** In analyzing Defendants' motion, the court assumes without deciding that the nature of the relationship imposed some fiduciary duties on Highpoint and Wood

27

relating to underwriting and issuance of policies. Even with this assumption, Companion's thirteenth cause of action fails because Companion fails to proffer evidence these Defendants owed any duty arguably breached by their alleged actions or inactions.

As noted above, Companion proffers evidence Highpoint (or other affiliated entities) provided information regarding insured risks that was input into Companion's Point system. The Point system printed out the policies based on the information provided. For purposes of Defendants' motion, the court will assume without deciding that Highpoint's role in providing the information, combined with admissions in its Answer and discovery responses, constitute "issuance" of the policies by Highpoint.

Companion's fiduciary duty claim does not rest on any assertion the information provided by Highpoint and used to issue the policies was inaccurate. Neither does Companion allege Highpoint failed to provide information necessary for the Point system to issue policies in the form that they were issued.[20]

Companion's claim, instead, rests on an assumption the policies issued were defective for failure to better clarify the risks covered. Companion does not, however, proffer any evidence that Highpoint determined the form of the policy or other evidence that might support imposition of a specific duty on Highpoint to modify the policy form.[21] Thus, Companion fails to proffer evidence

_____

[20] Companion, in fact, claims the information necessary to determine the scope of risks insured may be determined from records and information available if one looks below the surface of the policy language. Thus, it argues the state insurance guaranty funds and others seeking to impose liability on Companion for risks insured by Dallas National err in doing so.

[21] Companion, likewise, proffers no evidence any Defendant was involved in creating the Point system through which the policies were issued. That system, instead, appears to have been a program within Companion's data processing system.

28

necessary to support the particular fiduciary duty on which its claim relies. Companion also fails to proffer evidence of the language it maintains should have been used to avoid the third-party claims Companion is now facing. Companion, instead, offers only a general assertion that Highpoint should have done something differently that would have avoided confusion or, more accurately, that would have dissuaded state guaranty funds and others from pursuing what Companion maintains are unsupportable claims. This is insufficient to support a finding of breach, even if Companion established the existence of a relevant duty.[22] Under these circumstances, even assuming a fiduciary relationship existed between the parties, the claim for breach of fiduciary duty fails as a matter of law because there is no evidence Highpoint (or Wood) owed or breached the particular duty on which this claim necessarily depends.[23] Accordingly, the court grants Defendants' motion for summary judgment on Companion's thirteenth cause of action and denies Companion's motion for summary judgment on this claim.

## V.    Companion's Claim on the Wood Guaranty for Dallas National's Collateral Shortfall

Both sides seek partial summary judgment on Companion's fifteenth cause of action for enforcement of the Wood Guaranty, as it relates to Dallas National's obligation to fund reinsurance

_____

[22] Though not determinative, it is also significant Companion had at least the ability to review the information used to "issue" the policies and the form of the policy issued (given they were printed from Companion's Point system). There is no indication Companion objected to the inadequacy of the information contained in the policies until the third-party claims (which Companion maintains are unwarranted) were asserted against it.

[23] In addition to arguing Wood is liable based on the Wood Guaranty, Companion makes a conclusory argument that Wood was directly responsible for the lack of clarity in the policies due to his control over Highpoint. Companion does not suggest any action by Wood other than that taken through Highpoint. It follows that the evidence in support of this claim is no greater as to Wood than it is as to Highpoint.

collateral.[24]  Companion seeks a liability-only ruling that the Wood Guaranty "covers any shortfall in Dallas National reinsurance collateral." ECF No. 202 Argument § V.  Defendants seek summary judgment that the Wood Guaranty does not cover any Dallas National collateral shortfall for a variety of reasons.  Most critically, Defendants argue the "2013 Program Agreement" between Dallas National and Companion, effective April 1, 2013, superseded the 2006 Coverage Agreement as between these entities and resulted in the Wood Guaranty no longer covering Dallas National's obligation to fund collateral.  For reasons explained below, the court denies Companion's motion and grants partial summary judgment to Defendants on Companion's fifteenth cause of action.

**Companion's Arguments.**  Companion argues the plain language of the Wood Guaranty requires Wood to cover all obligations and liabilities arising under the 2006 Coverage Agreement, including any obligation of Dallas National to fund its collateral account.  ECF No. 202 Argument § V.  Anticipating Defendants' position that the obligations guaranteed were modified in 2013, Companion argues Wood's obligations "were not, nor could they have been, novated or superseded, in whole or in part, by a '2013 Program Agreement,' for at least four reasons." *Id.* First, Companion argues there could be "no novation or 'superseding' as a matter of law" because the parties to the agreements are different. *Id.* (citing cases addressing novation).  Second, Companion notes the 2006 Coverage Agreement expressly stated that "[n]o provision of this

---

[24]  Through this cause of action, Companion seeks damages and other relief "for Wood's failure to comply with the Wood Guaranty and Indemnity Agreement."  ECF No. 88 ¶ 196.  This claim does not identify any specific alleged default but, instead, incorporates "all prior paragraphs" and asserts the Wood Guaranty "requires that [Wood] indemnify and hold Companion harmless for some or all of the demands or claims made by or against Companion as referenced herein and in Defendants' counterclaims." *Id.* ¶ 194.  Thus, this cause of action includes but is not limited to allegations relating to underfunding of Dallas National's collateral.

Agreement may be amended or waived except pursuant to a writing signed by all of the Parties."
*Id.* Third, the Wood Guaranty itself was irrevocable, primary, absolute and unconditional irrespective of any amendment, modification, or waiver of the "Subject Agreement" (referring, inter alia, to the 2006 Coverage Agreement). Fourth, under South Carolina law, the maker of the written guaranty cannot impeach the express terms of the agreement to establish its termination. *Id.*

**Defendants' Arguments.** Defendants argue the 2013 Program Agreement, by its plain language, superseded the 2006 Coverage Agreement as between Companion and Dallas National. Thus, no breach occurring after the 2013 Program Agreement became effective could be a breach of the 2006 Coverage Agreement. It follows such a breach is not covered by the Wood Guaranty of the 2006 Coverage Agreement (and other agreements not relevant here).

Defendants also argue Wood should not be held responsible for some or all of the alleged shortfall for three additional reasons. First, Defendants argue PayGo and Occupational Accident Policies were never covered under the 2006 Coverage Agreement, placing them beyond the reach of the Wood Guaranty.[25] Second, Defendants argue Wood and Defendants are not responsible for the deficiencies because all arose after Dallas National's sale. Defendants further attribute the deficiencies either to Companion directly or to an investment manager hired by Companion. Finally, Defendants argue Companion has already been compensated through contributions made by Blue Cross and Blue Shield of South Carolina in connection with Companion's sale to Sussex Holdings, Inc.

--------

[25] Whether PayGo policies are covered under the 2006 Coverage Agreement is a disputed matter within the scope of the issues before the Northern District of Texas.

**Companion Response and Reply.**  In opposing Defendants' summary judgment motion, Companion argues, first, that it does not matter which entity is responsible for the collateral shortfall given the unconditional nature of the Wood Guaranty and, second, that there is no evidence Companion itself exercised control over the collateral before its value declined.  ECF No. 236 § III.A.1.c.ii; *see also* ECF No. 247 § V (similar argument on reply).  Companion also addresses Defendants' arguments that Companion has already been compensated and the shortfall is not as great as Companion claims.  ECF No. 236 § III.A.1.C.ii (ultimately arguing Companion is entitled to at least $25 million and the court should enter judgment in that amount).

**Discussion.**  The Wood Guaranty contains broad language significantly limiting if not precluding termination or waiver of Wood's obligation to ensure the AMS Entities (which included Dallas National) meet their obligations under the 2006 Coverage Agreement (and certain other related agreements).  For purposes of this order, the court assumes the Wood Guaranty itself could not be and was not modified by any action of any party.  The court, nonetheless, grants Defendants' motion for partial summary judgment that Wood is not obligated to cover any shortfall in Dallas National's collateral because that obligation ceased to be governed by the 2006 Coverage Agreement effective April 1, 2013.  For the same reason, Companion's cross-motion for partial summary judgment on its fifteenth cause of action is denied.

`      **Initial Agreement.**  Dallas National's obligation to fund collateral initially arose under the 2006 Coverage Agreement.  ECF No. 205 at 2 ¶ 1 (naming Dallas National as a party to the agreement and including it within the term "AMS Entities"); *id.* at 4 ¶ 8 (imposing reinsurance obligations on Dallas National); *id.* at 4-5 ¶ 13 (imposing collateral obligations collectively on AMS Entities).  The Wood Guaranty on which Companion relies for its fifteenth cause of action "absolutely and unconditionally guarantees to [Companion] the full and prompt performance and

32

payment . . . of each Obligor under the Subject Agreements." ECF No. 206 at 1, ¶ I.A. "Obligor"

is defined to include the AMS Entities (which included Dallas National under the 2006 Coverage

Agreement) and "Subject Agreements" is defined to include the 2006 Coverage Agreement, the

Policies issued under that agreement, and a related Third Party Claims Administration Agreement.

These provisions support the conclusion that the Wood Guaranty covered Dallas National's

obligation to fund collateral so long as that obligation arose from the 2006 Coverage Agreement.

      **March 2013 Sale and Extension Agreement.**  In March 2013, Wood sold Dallas National

"to an affiliate of Southport Lane, L.P." ECF No. 201-2 ¶ 2 (Decl. of Chris Nehls).  This sale did

not, in itself, modify Wood's obligation to guarantee Dallas National's performance.

      On or about March 31, 2013, all parties to the 2006 Coverage Agreement entered

"Extension Agreement #12." ECF No. 205 at 1.[26]  This agreement read, in full, as follows;

> The undersigned (the "Parties") are parties to that certain Coverage Agreement
> dated as of December 1, 2006 (the "Coverage Agreement").  The Coverage
> Agreement's expiration date was previously extended from December 1, 2011 to
> March 31, 2013.  *The Parties hereby agree to further extend the term of the
> Coverage Agreement until such time as either Companion Property and Casualty
> Insurance Company or Dallas National Insurance Company gives the other thirty
> (30) days' prior written notice of termination.  All other provisions of the Coverage
> Agreement remain in full force and effect.*
>
> EXECUTED AND DELIVERED as of March 31, 2013.

ECF No. 205 at 1 (emphasis added).

      This one paragraph agreement extended and modified the 2006 Coverage Agreement in

two ways.  First, the two signatories not owned by Wood, Dallas National and Companion, were

---

[26]  Despite the absence of a signature for AMS Staff Leasing NA, both sides characterize this
agreement as being executed by "all parties to the 2006 Coverage Agreement." *See*, *e.g.*, ECF No.
202 Facts § III (Companion's opening brief in support of summary judgment).

authorized by *all parties* to terminate the 2006 Coverage Agreement. Second, the 2006 Coverage Agreement, as amended, remained "in full force and effect" until either Companion or Dallas National gave the other written notice of termination. *Id.*

There is no evidence either Companion or Dallas National, thereafter, gave the other thirty (30) days prior written notice of termination of the 2006 Coverage Agreement. Neither is there evidence any party terminated the 2006 Coverage Agreement in its entirety. It is, however, undisputed that, in July 2013, Companion terminated the rights of the PEO Defendants and other Wood-owned entities to reissue or write new policies and entered the 2013 Program Agreement with Dallas National (effective retroactively to April 1, 2013). The critical question for purposes of the present argument is the effect of the 2013 Program Agreement.[27]

Companion argues the 2013 Program Agreement did not supersede Wood's obligation to guarantee performance under the 2006 Coverage Agreement. While this is correct, it ignores Defendants' actual argument which is that (1) the 2013 Program Agreement, to which Companion is a party, superseded Dallas National's obligations under the 2006 Coverage Agreement; and (2) because Dallas National's obligations after the 2013 Program Agreement was effective (April 1,

_____

[27] Though effective April 1, 2013, the 2013 Program Agreement was apparently not executed until July 2013. *See* ECF No. 222 (email forwarding fully executed agreement together with cover letter dated July 23, 2013). By this date, Companion had "terminated" the PEO Defendants' authority to issue new or renewal policies or extend new coverage under the 2006 Coverage Agreement. Ex. 100 to Regis Decl. (July 2, 2013 letter to PEO Defendants); *see also* ECF No. 201-1 § II.B.1 n.7 (describing three documents as notices of termination of Defendants "rights with respect to the 2006 Coverage Agreement" issued in July 2013, though one of the three notices related to the 2013 Program Agreement and was issued to Dallas National, apparently in February 2014); Ex. 101 to Regis Decl. (ECF No. 219-40 filed subject to motion to seal) (undated letter to Dallas National confirming oral directive "to immediately suspend writing new and renewal business on [Companion] paper," terminating the 2013 Program Agreement "for cause," and citing paragraphs 9, 12, and 22 of the 2013 Program Agreement).

34

2013) were governed solely by the 2013 Program Agreement, no Dallas National obligation remained under the 2006 Coverage Agreement for Wood to guarantee.

The essence of Companion's responsive argument appears to be as follows: (1) the 2013 Program Agreement covered only future relations between Companion and Dallas National and, consequently, had no application to policies issued (or obligations that initially arose) under the 2006 Coverage Agreement; (2) to the extent it might be read to cover policies issued (or obligations initially arising) under the 2006 Coverage Agreement, the 2013 Program Agreement is unenforceable because the 2006 Coverage Agreement precludes modification unless signed by all parties; and (3) the Wood Guaranty remains in full force and effect as to Dallas National's obligations. These arguments are addressed, in turn, below.

### A.    2013 Program Agreement

The Background section of the 2013 Program Agreement refers to a then-existing "Program" through which Dallas National or other "Program Participants" produce workers compensation, commercial general liability, and other policies, collectively referred to as the "Policies." 2013 Program Agreement § 2. It states this existing relationship had "been governed by that certain Coverage Agreement between the Parties (and certain DN Affiliates or former DN Affiliates) dated as of December 1, 2006 ('the Coverage Agreement')." *Id.* It defines "Program Related Agreements" to include the Coverage Agreement together with Policies issued under the existing Program, and reinsurance treaties with respect to the Policies, and "any and all other agreements contemplated by the Program to which [Companion] is a party, *in each case whether now existing or hereafter entered* into by [Companion.]" *Id.* (emphasis added). It also defines "Policies" to "include all policies issued pursuant to the Program prior to the Effective Date[.]" *Id.* (preserving Companion's right to compensation for periods predating the Effective Date). This

35

description of the relationship between the parties indicates the subject matter of the 2013 Program

Agreement is intended to encompass the relationship covered by the 2006 Coverage Agreement,

including obligations arising under both old and new policies issued as part of that relationship.

The 2013 Program Agreement 's integration clause, reads as follows:

> **28.     Entire Agreement.**   This Agreement (including any and all exhibits, schedules and other attachments referred to in this Agreement) constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any prior understandings, representations or agreements by or between the Parties (whether written or oral) to the extent the same are related to the subject matter hereof.

*Id.* § 28.  Read together with the Background section, this integration clause indicates the 2013

Program Agreement is intended to supersede all "Program Related Agreements" governing the

relationship between Dallas National and Companion, including but not limited to the 2006

Coverage Agreement.

Like the 2006 Coverage Agreement, the 2013 Program Agreement requires Dallas National

to fund an account "for the payment of all clams" and to replenish that account as requested by

Companion.  2013 Program Agreement § 10.  It also requires Dallas National to fund "one or more

reserve funds for Policy liabilities (collectively, the 'Claims Reserve Fund')" and provides the

amount in the Claims Reserve Fund shall at all times equal or exceed the applicable 'Required

Reserve' determined as set forth below." *Id.* § 14.A.  Succeeding sections address how the reserve

is established, referring, inter alia, to "Policy Liabilities" and "Program loss ratio experience."  *Id.*

§§ 14.A-F.[28]  Nothing in these sections suggests the underlying Policies or Program are limited to

---

[28]  This section refers to Dallas National's obligation to maintain, rather than its obligation to provide reinsurance.

36

anything less than Dallas National's entire obligation to Companion, particularly as it relates to a duty to maintain collateral. Thus, based on the description of the Program in the Background section, the general duties addressed in the remainder of the 2013 Program Agreement, and lacking any language limiting the scope of that agreement, the court finds the "subject matter" of the 2013 Program Agreement encompasses all of Dallas National's obligations under the 2006 Coverage Agreement. It follows that the 2013 Program Agreement's integration clause is intended to effect a complete replacement of the 2006 Coverage Agreement as between Companion and Dallas National.

**B.     2006 Coverage Agreement**

Despite being a party to the 2013 Program Agreement, Companion argues this agreement is unenforceable to the extent it is interpreted to supersede obligations between Dallas National and Companion previously governed by the 2006 Coverage Agreement. In support of this argument, Companion relies on a provision of the 2006 Coverage Agreement that states "[n]o provision of this Agreement may be amended or waived except pursuant to a writing signed by all Parties." 2006 Coverage Agreement ¶ 27. Companion further contends the 2013 Program Agreement could not have superseded the obligations of Companion and Dallas National under the 2006 Coverage Agreement because the 2013 Program Agreement was only signed by two of the parties to the 2006 Coverage Agreement, Companion and Dallas National.

In 2013, however, all parties agreed to an extension and modification permitting Companion or Dallas National to terminate the 2006 Coverage Agreement with thirty days written notice to the other. Thus, Companion and Dallas National were authorized (by all parties) to terminate their relationship under the 2006 Coverage Agreement.

The 2013 Program Agreement expressly provides that it is intended to supersede "any provision, understandings, representations or agreements by or between the parties . . . to the extent the same are related to the subject matter hereof. 2013 Program Agreement § 28. Dallas National's obligations under the 2006 Coverage Agreement were directly related to the subject matter of the 2013 Program Agreement and, thus, were superseded. As a party to the 2013 Program Agreement, Companion cannot complain that language in that agreement is given its clear and natural effect.

### C.     Wood Guaranty.

The Wood Guaranty, by its plain language, requires Wood to ensure full performance by all AMS Entities *under the 2006 Coverage Agreement*. For purposes of this order, the court assumes Wood's obligations under the Wood Guaranty could not be and were not changed by Wood's sale of Dallas National to a third-party or by that third-party's execution of a new guaranty.[29] Companion's fifteenth cause of action, nonetheless, fails as a matter of law as it relates to any failure of Dallas National to fund collateral. This is because, for reasons explained above, Dallas National's collateral-funding obligation (as it relates to Policies previously issued under the

---

[29] The 2013 Program Agreement is covered by a Guaranty and Indemnity Agreement between Companion and Southport Lane, LP ("2013 Guaranty"). That guaranty is described in the 2013 Program Agreement as an "essential inducement to [Companion] to enter into this Agreement." *Id.* § 21. While it is likely Companion would have required this guaranty based on loss of coverage of Dallas National's obligations under the Wood Guaranty (for reasons explained above), the court does not rely on the existence of the 2013 Guaranty in finding the Wood Guaranty was inapplicable to Dallas National's obligations after April 1, 2013. This is because Companion could have required an *additional* guaranty for any number of reasons.

"Program" which included the 2006 Coverage Agreement) were superseded by the 2013 Program Agreement.[30]

**Conclusion.**   The court, therefore, denies Companion's motion for partial summary judgment on its fifteenth cause of action and grants Defendants' motion for partial summary judgment that Companion cannot recover on the Wood Guaranty *for any shortfall in Dallas National collateral*.  This determination does not fully dispose of the fifteenth cause of action as the Wood Guaranty remains effective as to other AMS Entities (*e.g.*, for the PEO Defendants' obligation to fund collateral accounts for Below Deductible Payments).

## VI.     Companion's Claim for Violation of the South Carolina Unfair Trade Practices Act

Defendants (specifically Highpoint and Woods) also seek summary judgment on Companion's fourteenth cause of action for violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a) et. seq.  ECF No. 201-1 § II.F.  This cause of action is asserted solely against Wood and Highpoint, e.*g.*, ECF No. 88 ¶¶ 184, 185, and identifies only three allegedly deceptive and unfair acts:

> [1] writing Companion insurance policies far in excess of written limitations that Companion had placed on its premium volume and [2] creating a false set of records to hide these actions, and [3] in their issuance of Dallas National and Companion policies by failing to make clear which insured clients attached to which policy.

---

[30]  Two of Companion's four arguments against finding the 2013 Program Agreement superseded the 2006 Coverage Agreement as it relates to Dallas National's obligation rely on language in the Wood Guaranty limiting *his ability* to modify the terms or scope of that agreement.  These arguments miss the mark because the "modification" at issue here is neither a modification of the Wood Guaranty itself nor the direct result of any action by Wood.  It is, instead, the result of a new agreement between Companion and Dallas National.  As a party to that agreement, Companion cannot complain about the natural effect of its language.

ECF No. 88 ¶ 185.[31]

The first two acts correspond with allegations in Companion's tenth through twelfth causes of action for fraud, constructive fraud and breach of contract accompanied by a fraudulent act. ECF No. 88 ¶¶ 127-172. As explained below, these allegations relate primarily if not solely to PayGo policies and have been stayed to the extent so related. *Infra* § VII (addressing "PayGo" claims). The third act corresponds with the allegations in Companion's thirteenth cause of action for breach of fiduciary duty. That cause of action is addressed above. *Supra* § IV (granting summary judgment to Defendants).

Defendants argue the SCUTPA claim fails because Companion has failed to adduce evidence of public impact. As to this element, Defendants assume Companion will rely on the potential for repetition.[32] They suggest no such risk is present because Wood is retired and Highpoint does not currently engage in insurance operations. ECF No. 201-1 § II.F (citing *Wilson Grp. v. Quorum Health Res.*, 880 F. Supp. 416, 426 (D.S.C. 1995) for proposition that mere proof

---

[31] In its opposition memorandum, Companion suggests a broader basis for the SCUTPA claim by asserting it "relates to the entirety of Defendants' conduct as alleged in the Second Amended Complaint." ECF No. 246 § III.B.2. Companion also appears to suggest the cause of action is asserted against all Defendants by noting "Defendants Highpoint and Wood—*but not any of the other Defendants*—assert they are entitled to summary judgment with respect to one aspect of Companion's SCUTPA claim." *Id.* (emphasis added). In both respects, Companion ignores the wording of its own Second Amended Complaint, which specifically names two Defendants (Wood and Highpoint) and argues these Defendants "engaged in deceptive and unfair acts" in the three ways alleged in the SCUTPA cause of action. ECF No. 88 ¶¶ 185, 186.

[32] The Second Amended Complaint alleges the acts "are capable of repetition and adversely impact the public interest in several ways, including exposing policy holders to potentially unenforceable policies, eliminating Companion's reinsurance protection, which is ultimately designed to protect policyholders; and straining and burdening state guaranty funds." ECF No. 88 ¶ 187.

40

a party is still alive and engaged in the same business is not enough to establish potential for repetition).

Focusing on the third alleged wrongful act, Companion argues there is evidence of prior repetition. Specifically, it argues Defendants Wood and Highpoint repeatedly issued policies with potentially overlapping coverage.[33]  Thus, Companion points to specific evidence it maintains supports a finding of *prior* repetition.  Companion also argues Defendants' "misconduct has exposed state insurance guaranty funds around the country to massive liability" and their "refusal to reimburse claims and properly fund collateral exposes Companion to massive potential claim payment obligations and other liabilities for which it received no premium[.]"[34]

The court assumes for purposes of this order that the referenced prior repetition suffices to preclude summary judgment on this element.  Companion's SCUTPA claim, nonetheless, fails to the extent it relies on the third alleged wrong (issuing Companion and Dallas National policies to the same insured without making clear which insurer covers which risks) for reasons addressed

---

[33]  As noted above, these allegations correspond with allegations found in Companion's breach of fiduciary duty claim (thirteenth cause of action).  Companion suggests Defendants have limited their argument on potential for repetition to this aspect of the SCUTPA claim.  ECF No. 236 § III.B.2. (asserting Defendants' argument addresses only "one aspect of Companion's SCUTPA claim—their breach of fiduciary duty concerning the potentially overlapping policies").  Defendants' argument is not, however, limited to any specific aspect of the SCUTPA claim.  *See* ECF 201-1 § II.F ("Companion has failed to show how any alleged wrongful act by Wood or Highpoint has the potential for repetition.  Wood is retired, and Highpoint does not currently engage in insurance operations." (footnote omitted)).

[34]  The essence of Companion's breach of fiduciary duty claim and related SCUTPA allegations is that Highpoint and Wood failed to make clear whether Companion or Dallas National was responsible for a particular risk when both insurers covered the same insured.  At best, this suggests these Defendants' actions or inactions provided an opening for state insurance guaranty funds to pursue Companion for claims that should have been paid by Dallas National.

41

above as to Companion's corresponding thirteenth cause of action. *See supra* § IV. As explained with respect to that cause of action, Companion fails to proffer evidence Highpoint or Woods provided inaccurate or even incomplete information leading to issuance of these policies. It, instead, alleges they should have done something more to clarify which insurer covered which risks. *Id.* at 29 (noting, in granting summary judgment to Defendants on thirteenth cause of action, that Companion's claim rests on assumption policies were defective for failing to better clarify the risks covered but Companion failed to proffer evidence Highpoint determined the form of the policy or other evidence that might support imposition of a specific duty on Highpoint to modify the policy form). Accordingly, the court grants summary judgment to this extent.

As noted above, the first two alleged wrongs appear to relate primarily or solely to PayGo policies (or other policies Defendants maintain fall outside the scope of the 2006 Coverage Agreement and are not properly before this court).[35] To the extent they are so limited, these aspects of the SCUTPA claim are dismissed without prejudice to pursuit in the Texas Action for reasons explained below. *Infra* § VII.

## VII.   Companion's PayGo-Related Claims

Defendants seek summary judgment on all claims to the extent they relate to PayGo policies. ECF No. 201-1 § II.E. Defendants base this request on this court's prior orders staying such claims in favor of the first-filed Texas Action and that court's decision not to transfer the PayGo-related claims to this court. As Defendants note, the net result is the PayGo-related claims have not advanced in this court and discovery is now closed.

---

[35] Defendants argue both PayGo and Occupational Accident policies fall outside the scope of the 2006 Coverage Agreement and, consequently, are not properly before this court.

42

Defendants identify Companion's sixth through twelfth causes of action as claims relating primarily if not solely to PayGo policies.  They identify the thirteenth and fourteenth causes of action as claims relating, in part, to such policies, though they do not explain which aspects of these claims relate to PayGo policies.  While characterizing this aspect of their motion as a motion for summary judgment, Defendants assert granting the motion would "enabl[e]the parties to move forward with litigating the PayGo-related claims in Texas."  Thus, Defendants are, more accurately, seeking dismissal without prejudice.

Companion argues summary judgment is inappropriate because the claims have been stayed here, precluding discovery on these issues.  ECF No. 236 § III.B.3.  It also asserts the "Texas court has not issued a final ruling on whether these claims should be litigated in Texas or in South Carolina."  *Id.*  Companion maintains it is entitled to conduct discovery, in one venue or the other, before any dispositive motion is considered.  It does not contest Plaintiff's characterization of the sixth through twelfth causes of action as relating primarily (though perhaps not solely) to PayGo policies or the thirteenth and fourteenth causes of action as relating partially to PayGo policies.

On reply, Defendants maintain they are entitled to summary judgment because they have pointed to the absence of evidence to support the claims, thus shifting the burden to Companion to go beyond the pleadings and point to specific evidence supporting the claims.  ECF No. 246 § II.D.  They note this court's stay applied to claims other than the sixth cause of action "to the extent they involve PayGo policies within the scope of the Texas Action" and did not preclude claims other than claim six from advancing "unless the claim relates solely to PayGo policies."  *Id.* quoting ECF No. 109 at 3-4.  Thus, they argue the court should dismiss Companion's sixth cause of action based on its prior stay, should dismiss the seventh through twelfth causes of action if they relate solely to PayGo policies, and should grant summary judgment on those claims if they also

43

relate to other policies to which the stay did not apply. Defendants do not address the thirteenth and fourteenth causes of action in their reply.

**Discussion.** This court previously stayed the sixth cause of action and other causes of action to the extent they relate to PayGo policies. The court did so in order to avoid overlap or conflict with the Texas Action. Companion has not, therefore, had the opportunity to conduct discovery or otherwise advance its PayGo-related claims. As discovery has now closed and the remainder of this action is in the final stages before trial, the court concludes the proper course is to dismiss any causes of action that relate *solely* to PayGo policies *as well as* PayGo-related aspects of claims that relate to both PayGo and non-PayGo policies. This dismissal is without prejudice to Companion's right to pursue any PayGo-related claims in the Texas Action or such other claims as that court may allow based on a finding they are not governed by the 2006 Coverage Agreement.[36] *See supra* n.35.

This resolves, in full, the sixth cause of action in this proceeding. While the seventh through twelfth causes of action appear to relate primarily to PayGo policies (and were stayed to this extent), they may also relate to other categories of policy. The court dismisses these claims, in full, because Companion proffers no evidence or argument that it has prosecuted those claims to the extent they were not stayed. Dismissal is without prejudice to pursuit of any claims that have been or may be allowed to proceed in the Texas Action, whether related to PayGo claims or such other claims as that court may allow, so long as those claims do not relate to the categories

---

[36] While this court expresses no opinion on the venue issues in the Texas Action, it does note that transfer of the Texas Action to this court could not, at this stage, result in consolidation of the proceedings as discovery has closed and the action here is set for trial in May 2017.

of Policy covered by the first through fifth causes of action here (e.g., Master Policies or other non-PayGo policies issued to AMS Entities and their clients).

Companion's thirteenth and fourteenth causes of action (for breach of fiduciary duty and violation of the South Carolina Unfair Trade Practices Act) receive a slightly different treatment. The aspects of these claims that have not been stayed here are addressed in other sections of this order. *See supra* §§ IV, VI.  All other aspects of these claims are dismissed without prejudice to pursuing claims that have been or may be pursued in the Texas Action to the same extent noted above as to the sixth through twelfth cause of action.

In sum, the court (1) dismisses the sixth cause of action without prejudice in its entirety; (2) dismisses the seventh through fourteenth causes of action without prejudice to the extent they relate to PayGo policies or other claims that have been or may be pursued in the Texas Action and do not relate to policies addressed in the first through fifth causes of action here; and (3) in all other respects, dismisses the sixth through fourteenth causes of action with prejudice (including based on the summary judgment rulings in §§ IV and VI above).

## VIII.   Related Motions to Strike and Exclude

To the extent not mooted by rulings above, the court denies Defendants' motion to exclude McGimsey's opinion testimony and to strike his declaration.  The court, likewise, denies Companion's motion to strike.  The denial of these motions is without prejudice to the parties' right to object to corresponding testimony at trial.

## CONCLUSION

For reasons set forth above:  (1) Companion's motion for partial summary judgment is granted as to Defendants' sixth counterclaim and denied in other respects; (2) Defendants' motion for partial summary judgment is granted as to Companion's thirteenth cause of action (in full),

45

fourteenth cause of action (to the extent it overlaps with the allegations in the thirteenth cause of action), fifteenth cause of action (to the extent it relates to Dallas National's collateral obligations), sixth though twelfth causes of action (which claims are dismissed without prejudice as to claims that may proceed in the Texas Action), and denied in other respects; (3) Defendants' motions to exclude McGimsey's opinion testimony and to strike his declaration are denied, and (4) Companion's motion to strike is also denied.

      IT IS SO ORDERED.

s/Cameron McGowan Currie
CAMERON McGOWAN CURRIE
SENIOR UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
January 10, 2017